1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  HEIDI LYNETTE STEVENS, | Case No.  1:19-cv-00428-NONE-SAB |
| 12  Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| 13  v. | |
| 14  COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 18, 23, 24) |
| 15  Defendant. | |
| 16 | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

17

## I.

18

## INTRODUCTION

19    Heidi Lynette Stevens ("Plaintiff") seeks judicial review of a final decision of the

20  Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

21  disability benefits pursuant to the Social Security Act.  The matter was referred to a United

22  States magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

23    Plaintiff suffers from bradycardia, coronary heart disease, atherosclerotic heart disease,

24  moderately severe chronic obstructive pulmonary disease, cervical spondylosis, arthritis of the

25  knees, liver disease, peripheral neuropathy, diabetes mellitus II, posttraumatic stress disorder,

26  attention deficit hyperactivity disorder, bipolar disorder, borderline personality disorder,

27  depression, and anxiety.  For the reasons set forth below, the Court recommends that Plaintiff's

28  Social Security appeal be denied.

## II.

## BACKGROUND

### A.    Procedural History

On March 10, 2015, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, and a Title XVI application for supplemental security income.  (AR 308-315.)  Plaintiff alleged disability beginning on January 27, 2011.  (AR 308.)  Plaintiff's application was initially denied on July 28, 2015, and denied upon reconsideration on December 4, 2015.  (AR 237-253.)  Plaintiff requested a hearing and appeared before Administrative Law Judge Matilda Surh (the "ALJ") on November 29, 2017.  (AR 64-108.)  On March 29, 2018, the ALJ issued a decision finding Plaintiff was not disabled.  (AR 15-28.)  On January 28, 2019, the Appeals Council denied Plaintiff's request for review.  (AR 1-6.)

Plaintiff filed this action on April 3, 2019, and seeks judicial review of the denial of her application for disability benefits.  (ECF No. 1.)  On February 10, 2020, Plaintiff filed an opening brief.  (ECF No. 18.)  On May 20, 2020, Defendant filed a brief in opposition.  (ECF No. 23.)  On June 5, 2020, Plaintiff filed a reply brief.  (ECF No. 24.)

### B.    The Relevant Hearing Testimony

On November 29, 2017, Plaintiff appeared for an administrative hearing before the ALJ.  (AR 64-108.)  Plaintiff was 45 years old on the day of the hearing.  (AR 68.)  Plaintiff lived in a first floor apartment with one daughter that was twenty-three (23) years old at the time.  (Id.)  Plaintiff finished high school and completed some college.  (Id.)  Plaintiff received a medical assistant vocational certificate and a nursing assistant vocational certificate; however, neither certificate was current.  (AR 69.)  Plaintiff does not work and supports herself through general relief through the county.  (Id.)

At her position with Mentor Management, Plaintiff worked assisting with the care of mentally and physically disabled people.  (Id.)  Plaintiff's nursing work included physically lifting the patients, such as for bathing.  (AR 69-70.)  Plaintiff's work with Loyd's Liberty Homes was similar.  (AR 70.)

Plaintiff is able to do household chores, such as cooking, cleaning, and laundry.  (AR 71.)

Plaintiff can walk approximately the distance of three houses before needing to sit down.  (Id.)  Plaintiff would then need approximately twenty minutes of rest before proceeding with walking.  (Id.)  The ALJ inquired about the four-wheeled walker that Plaintiff brought into the hearing and Plaintiff stated she always uses the walker, including inside the house.  (AR 71-72.)  Plaintiff uses the walker because she has no balance.  (AR 72.)  Plaintiff was unsure of the precise cause of the balance issue, stating she is in a high fall risk group, did not know if the issue was from the "diagnosis" or the medication levels, and she has fallen causing displacement of her pacemaker.  (Id.)  Plaintiff's cardiologists prescribed the use of the walker, and one doctor provided one in 2013, and the one she was using was provided in 2014.  (AR 72-73.)  Plaintiff last fell about a month prior to the hearing, when she was walking inside.  (AR 73.)  Plaintiff was using the walker but lost her footing and flipped over.  (Id.)  Plaintiff is generally able to bathe and get dressed, but following a recent pacemaker revision surgery, Plaintiff requires minimal assistance with things like putting on a bra.  (AR 73-74.)

Plaintiff had computed tomography (CT) scans of the knees done in 2014 or 2015.  (AR 74.)  The ALJ notified counsel of an inability to find the original diagnostic results for x-rays or CT scans of the knees.  (AR 74-75.)  Plaintiff receives steroidal injections and pain medication for her knees, and stated the injections are helpful.  (Id.)  Plaintiff stated she wanted physical therapy or hydrotherapy, but stating she only gets what Medi-Cal pays for.  (AR 76.)

As for imaging of the back, Plaintiff testified that it was difficult to obtain because of the pacemaker and the insurance company/Medi-Cal issues  (AR 75.)  When asked what type of treatment was recommended for the back, Plaintiff stated she keeps trying to file appeals and going to hearings to get approved for imaging, but has not been prescribed treatment other than pain medication.  (AR 79.)  Plaintiff experiences side effects from the pain medication, such as vomiting, diarrhea, and dizziness.  (AR 79-80.)  Plaintiff vomits a lot and was prescribed medication to stop the vomiting, and when asked for clarification as to why the doctors would prescribe medicine to stop the vomiting rather than change the medication causing it, Plaintiff stated the doctors were not sure what was causing the vomiting.  (AR 80.)  Plaintiff feels the morphine is the medication that mostly causes the nausea, but the doctors never recommended

1  stopping use of morphine.  (Id.)

2      Plaintiff is receiving mental health treatment but says she is back in "stage one" because
3  she is undergoing a reevaluation.  (Id.)  Plaintiff sees a counselor, a psychotherapist, and a case
4  manager.  (AR 77.)  When asked why she is unable to work, Plaintiff averred that her "house is
5  too bad," that she has a lot going on, mentally and physically she hurts all the time, and feels
6  tired and sick.  (Id.)  As for mental symptoms, Plaintiff feels tired and cries a lot, is depressed,
7  and doesn't want to leave her room.  (AR 77-78.)

8      As for physical pain, Plaintiff feels pain in the chest, back, and stomach.  (AR 78.)  The
9  pain in the chest is from the pacemaker, and from angina.  (Id.)  Plaintiff also has some lung pain
10 when trying to take deep breaths.  (Id.)  Plaintiff is taking steps to cut down smoking but still
11 smokes about five cigarettes a day.  (AR 78-79.)  Plaintiff confirmed her doctors want her to
12 completely quit smoking.  (AR 79.)

13     In a typical day, Plaintiff usually gets up about noon or 1 p.m., takes a shower, eats
14 something and then she sits in her room and crochets most of the time.  (AR 81.)  Plaintiff
15 confirmed she is able to prepare her meals and things like that.  (Id.)  Plaintiff is able to go
16 shopping.  (AR 77.)  Plaintiff goes to bed around 11:00 p.m.  (AR 81.)

17     Plaintiff was then examined by her counsel.  Plaintiff confirmed she does need help doing
18 some housework because she is slow or unsteady.  (AR 81-82.)  Plaintiff's daughter does about
19 95% of the housework and cooking.  (AR 82.)  When asked what type of problems she has with
20 cooking, Plaintiff stated the previous year she forgot about the cooking and caught the stove and
21 refrigerator on fire.  (Id.)  The fire department was not called but the daughter put out the fire
22 with a fire extinguisher.  (AR 82-83.)

23     Plaintiff has had three revisions of her pacemaker.  (AR 83.)  One time was due to
24 Plaintiff falling while walking and the pacemaker was dislodged.  (Id.)

25     When asked about assistance with bathing, Plaintiff now testified she needs help getting
26 into the bathtub every time.  (AR 84.)  When asked by counsel, Plaintiff claims the longest she
27 can work doing chores or household activities is five minutes, which is the time she can remain
28 standing on her feet.  (AR 84.)  Her main position during the daytime is sitting.  (Id.)  When

1   Plaintiff is fatigued she lies down, usually for long periods of time such as six hours.  (AR 85.)
2   Plaintiff states that is about half of the time she is awake during a twelve hour period.  (Id.)

3        Plaintiff testified she is able to distinguish pain from angina from other types of chest
4   pain, and that she does not take nitro for the pain because it drops the heart rate and blood
5   pressure and that would not be good with the pacemaker.  (Id.)  Plaintiff takes aspirin to
6   compensate for not being able to take nitro.  (Id.)

7        Plaintiff confirmed she has tried at least two methods of quitting smoking and has been
8   enrolled in No Butts for about one year.  (AR 86.)  Plaintiff has reduced the amount she smokes
9   from about two packs a day to about five cigarettes per day.  (Id.)

10        Plaintiff cries a lot, every morning when waking up or at different parts of the day.  (Id.)
11  Plaintiff cries about three times a day on average.  (Id.)  The crying spells usually last about an
12  hour or two, during which Plaintiff tries to cheer herself up by crocheting.  (AR 87.)  Plaintiff
13  confirmed this means she spends more than fifty percent (50%) of her day crocheting.  (Id.)
14  During this time, Plaintiff sits in what she describes as a prone position, like an L-shape, sitting
15  against the bed with her legs up and back against the frame.  (Id.)  She also crochets sitting.  (AR
16  87-88.)

17        When asked if Plaintiff thinks she could do a job crocheting eight hours a day for five
18  days a week, Plaintiff stated she could not because of arthritis and all of the other stuff going on,
19  but wishes she could.  (AR 88.)  Plaintiff confirmed she has some problems when crocheting
20  which causes her to stop, such as arthritis and vision problems.  (Id.)  Plaintiff confirmed she has
21  not had any treatment for finger arthritis because "they just treat me overall for all of it until they
22  can figure out what's going on."  (Id.)

23        Counsel asked if Plaintiff's crocheting indicates she can do such activity without
24  problems focusing, and Plaintiff responded no, she doesn't focus at all, and that is why she does
25  it, to try and get focused.  (Id.)  Counsel asked for clarification.  (AR 88-89.)  Plaintiff explained
26  that sometimes her mind goes very fast and can't slow down, and crocheting allows her to come
27  back to reality, and increases her focus.  (AR 89.)  Plaintiff then answered that she can focus for
28  about thirty minutes at a time before she has to stop.  (Id.)  When asked why she stops, she says

mostly fatigue.  (Id.)

Plaintiff confirmed she suffers from urinary issues, including a full prolapse requiring surgery, however the surgery did not go well.  (AR 90.)  Plaintiff was to undergo testing the month after the hearing to see if she has erosion from the bladder sling.  (Id.)  Plaintiff also suffers from bleeding from the hysterectomy mark that she was receiving treatment for.  (Id.)  Plaintiff has trouble holding in urine and wears protective padding which she changes every couple of hours.  (Id.)  Because of her limitations, it takes about twenty to thirty minutes to change the padding in the restroom.  (AR 91.)

Plaintiff confirmed she has had several different gastrointestinal ("GI") diagnoses and is aware of some of them.  (Id.)  Counsel inquired about the impact of the GI issues on the ability to have a sit-down job, and Plaintiff stated she suffers from constant diarrhea and vomiting that impedes her from sitting down and doing anything because of the stomach cramping and discomfort.  (Id.)  Counsel inquired as to what Plaintiff meant by "constant," and Plaintiff stated it is like an urgency that causes her to be running to the toilet every twenty to thirty minutes when she has a bout, it hits quickly and she is in the bathroom for a while.  (Id.)  Plaintiff states that lately, every day seems to be a bad day, and that over the last three years, four out of seven days are bad days.  (AR 92.)  Plaintiff confirmed that the doctors were unsure of the cause but did say it could be one of the GI diagnoses, in addition to the medication.  (Id.)

Plaintiff confirmed that she is still suffering from hemorrhoids and has been diagnosed with ulcerative colitis.  (Id.)  Plaintiff confirmed she has stress incontinence that gets worse with stress.  (AR 93.)  Plaintiff says the things that cause stress are life, everything, being around too many people, crowded enclosed rooms, with crowded meaning more than five people.  (AR 93.)  When asked by counsel if she could work with two people at a work station, Plaintiff said she did not know.  (AR 93-94.)

Counsel inquired about a medical form that indicated Plaintiff socially isolates herself, and Plaintiff confirmed that was true.  (AR 94.)  Counsel asked how often she isolates herself, and Plaintiff answered every day.  (Id.)  Counsel asked for clarification because Plaintiff had previously sated some days were worse than others and on some days Plaintiff goes to the doctor

1  or goes shopping.  (Id.)  Plaintiff answered she isolates herself on average about five out of seven

2  days per week in the past three years.  (AR 95.)  Plaintiff confirmed she suffers from related

3  chronic fatigue.  (Id.)

4      Plaintiff confirmed she receives several types of pain management at the pain center,

5  including pain medication and injections.  (Id.)  Plaintiff confirmed she still has pain in the

6  knees, back, and the neck.  (Id.)

7      Plaintiff weighs 260 pounds, and confirmed her weight increases her depression and pain.

8  (AR 95-96.)  Plaintiff confirmed she is trying to lose weight and that she was scheduled to have a

9  gastric bypass in April, though no specific date had been set.  (AR 96.)

10     Plaintiff confirmed that she took a pulmonary function test for chronic obstructive

11 pulmonary disease (COPD), and that she was given a nebulizer in 2012.  (Id.)  Plaintiff stated she

12 uses the nebulizer four times a day, for about thirty minutes each time to allow for the

13 medication to finish.  (AR 97.)  Plaintiff continues to see her cardiac doctor for her coronary

14 artery disease for blockages.  (AR 97.)  Counsel inquired as to whether Plaintiff was under the

15 level for a bypass or stents, and Plaintiff stated she has about 50 to 60 percent blockage, and you

16 have to have about 70 percent.  (AR 97-98.)

17     Plaintiff confirmed she has been taking pills for diabetes since 2013.  (AR 98.)  Plaintiff

18 confirmed she has problems with neuropathy from the diabetes in the arms and legs, causing a

19 sensations of pins and needles, and burning, every day.  (AR 98-99.)  Plaintiff takes gabapentin

20 for these issues, and it does help.  (AR 99.)  The arm pain causes issues reaching forward, and

21 Plaintiff cannot reach forward with both hands.  (Id.)

22     Plaintiff says she pretty much cannot use her left arm because of surgery and muscle tone

23 that never recovered properly.  (Id.)  Plaintiff confirmed she is right handed.  (AR 100.)  Plaintiff

24 confirmed she could reach forward with her right arm if she had a job doing that eight hours per

25 day.  (Id.)

26     Plaintiff confirmed that her neuropathy is one of the reasons she has trouble being on her

27 feet for long periods of time.  (Id.)  Plaintiff testified doctors are working on determining why

28 she sleeps so many hours, and they have said it is related to her heart problems and not getting

1   enough oxygen to the brain.  (<u>Id.</u>)  Plaintiff confirmed she had been seeing her cardiologist Dr.

2   Joshi since approximately 2009.  (AR 100-101.)

3          The vocational expert (the "VE") Cheryl Chandler then provided testimony.  (AR 101.)

4   The first hypothetical presented a person with the same age, education, and work experience as

5   the Plaintiff, and that could lift 20 pounds occasionally, 10 pounds frequently, stand/walk/sit for

6   six out of eight hours a day, would need to avoid concentrated exposure to pulmonary irritants,

7   could occasionally climb ladders, ropes, or scaffolds, could occasionally balance, could not work

8   at heights, and is capable of non-complex and routine tasks.  (AR 102.)  The VE testified that

9   such limitations would eliminate all past work.  (AR 103.)  Such person could perform work as:

10  (1) counter attendant with 80,000 jobs nationally; (2) cafeteria attendant with 100,000 jobs

11  nationally; and (3) cashier with 600,000 jobs nationally.  (<u>Id.</u>)

12         The second hypothetical would need a walker for all ambulation.  (<u>Id.</u>)  The VE

13  confirmed this person could only perform sedentary work.  (AR 104.)  Some available work

14  included: (1) ticket counter with 100,000 jobs nationally; (2) charge account clerk with 30,000

15  jobs nationally; (3) telephone clerk with 180,000 jobs nationally.  (<u>Id.</u>)

16         Plaintiff's counsel then examined the VE and presented a third hypothetical that would

17  miss one day of work per week due to isolation and mental illness.  (AR 104-105.)  The VE

18  confirmed that missing four days a month would not be tolerable and there were no jobs

19  available.  (AR 105.)

20         Plaintiff's counsel then presented hypothetical four that is the same as number two but

21  with unscheduled work breaks on average two times per day for fifteen minutes when needed for

22  nebulizer treatment.  (<u>Id.</u>)  The VE confirmed such breaks would not be tolerable.  (<u>Id.</u>)

23         The fifth hypothetical presented by counsel was the same as number two with a

24  requirement to use the restroom for combined urinary and bowel movements that would occur on

25  average every 30 to 45 minutes throughout the workday, and the VE again confirmed that would

26  be too much time off of task.  (<u>Id.</u>)  The VE also confirmed that a requirement of laying down

27  one to two hours per eight hour shift would be unacceptable.  (AR 105-106.)

28         In closing, counsel emphasized that since the last denial for benefits, Plaintiff's condition

1  worsened with multiple new diagnoses and evidence of greater disabling conditions.  (AR 106.)

2  The ALJ indicated that she would wait two weeks for additional x-ray results, and then would

3  look at all the evidence and issue a decision.  (AR 107.)

### C.     The ALJ's Findings

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015.

- Plaintiff has not engaged in substantial gainful activity after the alleged onset date of January 27, 2011.

- Plaintiff has the following severe impairments: nonobstructive coronary artery disease, bradycardia status-post pacemaker placement, chronic obstructive pulmonary disease ("COPD"), asthma, tobacco abuse, borderline personality disorder, adjustment disorder, bipolar disorder, and anxiety disorder.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform light work with the following limitations: can lift and carry 20 pounds occasionally and 10 pounds frequently; can sit, stand, and walk six hours in an eight-hour workday; must avoid concentrated exposure to pulmonary irritants such as dusts, gases, and fumes; can occasionally climb ladders, ropes, scaffolds, and can occasionally balance; cannot work at heights; is mentally limited to noncomplex and routine tasks.

- Plaintiff is unable to perform any past relevant work.

- Plaintiff was born on December 30, 1971, and was 39 years old, defined as a younger individual aged 18-49, on the alleged disability onset date.

- Plaintiff has at least a high school education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the Plaintiff is "not disabled," whether or not the Plaintiff has transferable job skills.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, from January 27, 2011, through the date of the ALJ's decision.

(AR 18-27.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.

Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.

Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

1   Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

2        Congress has provided that an individual may obtain judicial review of any final decision

3   of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).

4   In reviewing findings of fact in respect to the denial of benefits, this court "reviews the

5   Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

6   disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v.

7   Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).  "Substantial evidence" means more than a

8   scintilla, but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)

9   (internal quotations and citations omitted).  "Substantial evidence is relevant evidence which,

10  considering the record as a whole, a reasonable person might accept as adequate to support a

11  conclusion."  Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

12  Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

13       "[A] reviewing court must consider the entire record as a whole and may not affirm

14  simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting

15  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not

16  this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

17  for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

18  susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

19  upheld.").

20  **IV.**

21  **DISCUSSION AND ANALYSIS**

22       Plaintiff raises three primary arguments: (A) the ALJ erred in assessing Plaintiff's cardiac

23  disease; (B) the ALJ's RFC finding is based on an inadequate record; (C) the ALJ failed to

24  provide valid reasons for rejecting the lay evidence.  (Pl.'s Opening Br. ("Br."), ECF No. 18; Pl's

25  Reply ("Reply"), ECF No. 24.)

26       **A.**    **Whether the ALJ Erred in Assessing Plaintiff's Cardiac Disease and RFC**

27       Plaintiff's argues her treating cardiologist opined that Plaintiff's cardiac impairment by

28  itself was disabling, and that the ALJ's rejection of the opinion is error.  (Br. 23; AR 1759.)

1          1.      Evidence in the Record Emphasized by Plaintiff

2          Plaintiff highlights the following aspects of the record (Br. 24-25):  Plaintiff had a history

3 of chest pain that was treated with narcotics.  (AR 999-1000 ("The patient has a determination

4 that her symptoms of epigastric and chest pain are related to her pericardial cyst.  This pain has

5 required hospitalization and is requiring narcotic medications for relief.").)  In July 2013, she

6 underwent an EKG that was termed abnormal because it revealed a marked right-precordial

7 repolarization disturbance (AR 1595); in September 2013, a left heart catheterization showed

8 nonobstructive coronary artery disease (AR 508-10); and, in October 2013, Plaintiff visited the

9 ER and loculated pleural effusion was identified by radiology (AR 985.)  On October 26, 2013,

10 Plaintiff underwent surgery for excision of a pericardial cyst.  (AR 1000-1002.)  Thereafter, her

11 chest pain continued and, in December 2013, certain testing and imaging results were abnormal.

12 (AR 1012 (CBC and Differential showed abnormal WBC; Chemistry 10 Panel showed abnormal

13 anion gap, calc. osmolality, and BUN/Creat. ratio; and a Manual Differential showed abnormal

14 Abs Neut Manual; all other components were within normal limits).)  On December 18, 2013,

15 Dr. Le, Plaintiff's cardiologist, noted she was experiencing bradycardia, or slow heart beat, and

16 noted follow-up in six months.  (AR 1245-46).

17          In April 2014 and June 2014, Plaintiff presented to the ER with chest pain, and laboratory

18 tests and EKG results were still abnormal.  (AR 1014 (on April 19, 2014, Plaintiff's physical

19 exam showed cardiovascular was normal with regular rhythm, normal heart sounds, no murmur,

20 and pulmonary/chest showed normal effort and breath sounds, no respiratory distress, no

21 wheezing, while EKG was unchanged, and Chemistry 10 Panel showed abnormal Anion Gap);

22 AR 1036 (on July 21, 2014, Plaintiff's cardiovascular and respiratory physical exam was normal,

23 also noted "atypical sounding CP, recent negative stress test in April.  Pt is not concerned about

24 her CP but concerned about her HA," and chemistry 10 panel showed abnormal glucose, and

25 urinalysis showed abnormal urobilinogen, blood, RBC, bacteria, and oxalate crystals).)

26          Plaintiff emphasizes it was not until November 2014 that Plaintiff was diagnosed with

27 symptomatic bradycardia and a pacemaker was implanted in her left chest.  (AR 1233-45).  A

28 week later, she underwent an atrial lead revision because her pacemaker was malfunctioning.

1   (AR 1062-73).  In December 2014, Plaintiff presented to an ER with sharp chest pain and it was

2   determined she had chronic pain at her pacemaker site.  (AR 1078-90.)  Twice in January 2015,

3   Plaintiff went to the ER because of increased chest pain and shortness of breath.  (AR 1091,

4   1093.)[1]  The second time, Plaintiff also experienced syncope and was kept in the hospital for

5   four days for observation.  (AR 1093-1110.)

6       On March 18, 2015, Plaintiff reported to the ER because she had fallen and feared her

7   pacemaker wires had dislodged.  (AR 1111.)  Plaintiff's symptoms improved and she was

8   advised to follow up with her cardiologist the next morning.  (AR 1113.)  On March 25, 2015,

9   Plaintiff saw Dr. Le, and diagnoses included coronary artery disease and bradycardia - sinoatrial

10  node dysfunction, in addition to results of an EKG termed abnormal.  (AR 1466, 1470.)

11      Thereafter, Plaintiff's cardiologist was Dr. Joshi, Dr. Le's colleague.  (AR 1432.)  On

12  October 1, 2015, Plaintiff told Dr. Joshi she was having heart palpitations at rest, dizziness,

13  episodes of pressure on her chest, and shortness of breath after walking a half block.  (Id.)  Dr.

14  Joshi indicated Plaintiff's pacemaker was functioning properly, ordered tests, noted Plaintiff has

15  multiple coronary risk factors, was advised to exercise, maintain diet, lose weight, and quit

16  smoking, with a scheduled a follow-up in four months.  (AR 1436.)

17      On February 19, 2016, Plaintiff presented to an ER because she was experiencing severe,

18  mid-substernal pressure-like chest pain and shortness of breath.  (AR 1859.)  An EKG revealed

19  anteroseptal wave abnormalities and laboratory testing revealed an elevated white blood cell

20  count and other abnormal findings.  (AR 1862-63 ("NSR, anteroseptal twi and slogt Std").)

21  Plaintiff was admitted to the hospital for a cardiac workup and diagnosed with symptomatic

22  bradycardia, coronary artery disease (CAD) and atypical chest pain.  (AR 1858, 1863.)

23      On April 22, 2016, Plaintiff presented to an ER with chest pain and the attending

24  physician indicated her pain could be caused by pacemaker irritation.  (AR 1824, 1827-28

25  ("Primary concern is that one if her pacemaker leads has moved, but xray negative.  Trop

---

26  [1]  While Plaintiff states in briefing that she went to the ER because of shortness of breath (Br. 24), the record dated
27  January 9-10, 2015, states "no shortness of breath" twice.  (AR 1091.)  The January 24, 2015 record also states
    "Negative for cough and shortness of breath."  (AR 1093.)  However, the record also states "Per family, patient
28  experienced a witnesses(family) episode of confusion followed by, syncope, shallow breathing, lips turning blue,
    with seizure like activity and postictal."  (AR 1093.)

negative and electrocardiogram unchanged from prior, making acute coronary syndrome less likely given 10 days of symptoms.  Possible that patient's cp is related to pacemaker irritation. Less likely pe/dissection by history/exam.").)   On July 8, 2016, Plaintiff was experiencing midsternal chest pain and an EKG was performed in the ER revealed ST depressions with T wave inversions at anterior leads V1, V2 and V3, as well as T wave flattening at V4, V5 and V6. (AR 1807 ("2nd EKG demonstrates anterior TWI, which is unchanged from old EKG.  Trop neg x 2.  acute coronary syndrome is considered, but is felt to be less likely.").)

When Plaintiff saw Dr. Joshi a week later on July 14, 2016, Plaintiff's heart rhythm was irregular and diagnosed atherosclerotic heart disease of the native coronary artery.  (AR 1983-84.)  On July 31, 2017, Dr. Joshi opined that due to her cardiac disease, Plaintiff was unable to work full-time at any exertional level.  (AR 1759.)  Dr. Joshi listed her primary impairments as coronary artery disease, angina, bradycardia, dizziness, and irregular heart rhythm.  (Id.)  Dr. Joshi opined Plaintiff could sit for eight hours, but could only stand or walk 20-100 feet, and must lie down to elevate her legs for at least two hours during an 8-hour day.  (Id.)

On September 29, 2016, Plaintiff presented to an ER with chest pain and shortness of breath and she underwent a cardiac catheterization that showed her left ventricular end diastolic pressure was elevated.  (AR 1785, 1794.)  The procedure also showed angiographically normal coronary arteries, and normal global LV systolic function.  (AR 1785.)

On October 6, 2016, Plaintiff returned to the ER with chest pain and her white blood cell count was still elevated, and results of her EKG were unchanged from previous.  (AR 1775, 1778.)  On October 19, 2016, Plaintiff saw Dr. Joshi who indicated Plaintiff was "doing fine," that her pacemaker leads "were probably dislodged," and would refer to a Dr. John.  (AR 1934.)

On January 9, 2017, Plaintiff underwent a pacemaker lead replacement procedure and on January 27, 2017, she was still experiencing chest pain and Dr. Joshi referred her to a surgeon (Dr. John) for a possible repositioning of her atrial lead.  (AR 1762, 1909-13.)  Plaintiff states that in April of 2017 and July 2017, Plaintiff continued to have chest pain and her EKG results were still abnormal.  (Br. 25, citing AR 1763-64, 1903.)  Specifically, on April 12, 2017, Plaintiff presented with chest pain, an EKG showed no significant change, and the doctor noted

1  under patient progress that: "patient is clinically stable and symptomatically improved.

2  Discussed reassuring nature of results and importance of regular follow up and medication

3  compliance." (AR 1763-64.) The second record cited appears to be an abnormal EKG from July

4  of 2017, though the precise date is illegible. (AR 1903.)

5  Finally, on October 10, 2017, Dr. John, a surgeon, performed a pacemaker lead extraction

6  of the malfunctioning right atrial lead, and implantation of a new pacemaker lead. (AR 1901).

7  This is the last cardiac treatment in the record. (Br. 25.)

8  2.   Plaintiff's Arguments

9  Plaintiff argues that although the record indicates the cardiac disease was difficult to

10  diagnose and treat, it does not indicate with any certainty why this was the case, and the record

11  shows Plaintiff experienced severe chest pain and shortness of breath throughout the relevant

12  time period. (Br. 26.) Even though Plaintiff continued to have chest pain and shortness of breath

13  after the pacemaker was implanted in November of 2014, Plaintiff did not undergo a cardiology

14  workup until February of 2016, at which symptomatic bradycardia was diagnosed. (Br. 26, AR

15  1858, 1863.) Thereafter Plaintiff repeatedly sought treatment for severe chest pain and shortness

16  of breath, and EKG results continued to be abnormal. (Br. 26, AR 1755, 1760-64, 1778, 1786,

17  1803, 1807, 1824, 1909-13, 1931.) Plaintiff states that although the leads to the pacemaker were

18  displaced, it is not clear that this was the sole cause of her debilitating symptoms because she

19  was also diagnosed with atherosclerotic heart disease and her left ventricular end diastolic

20  pressure was elevated. (BR 26, AR 1794, 1984.) It was after Plaintiff's cardiology workup in

21  February of 2016 that Dr. Joshi offered his opinion that Plaintiff was unable to work full time at

22  any exertional level. (Br. 26, AR 1759.)

23  Plaintiff challenges the reasons provided by the ALJ for rejecting Dr. Joshi's opined

24  limitations. Specifically, the ALJ acknowledged that Dr. Joshi was a treating cardiologist, and

25  rejected the opinion for the following reasons:

26  In July 2017, the claimant's cardiologist, Bipin Joshi M.D., completed a form
assessment in which he stated that the claimant's heart impairments prevented her
27  from performing any full time work at any exertional level. He stated that the
claimant needed to lie down and/or elevate her legs daily for at least two hours,
28  and could not walk more than a total of 100 feet a day [AR 1759]. This opinion is

given little weight, notwithstanding the treatment relationship between the claimant and Dr. Joshi. It is inconsistent with the unremarkable results of chest imaging studies and EKGs since the alleged onset date, and with the normal heart sounds, clear lungs, normal-appearing extremities, normal sensation and reflexes, normal strength and tone, and normal gait that the claimant's doctors consistently have documented in examinations [AR 482-559, 570-869, 955-1141, 1142-1198, 1199-1257, 1310-1315, 1432-1470, 1471-1562, 1760-1874, 1901-2015]. This same evidence warrants giving significant weight to the opinions of State agency medical consultants L. Bobba, M.D., and A. Khong, M.D., who reviewed the record in July and December of 2015, respectively. Both State consultants expressed the opinion that the claimant could perform light work that did not involve concentrated exposure to pulmonary irritants [AR 135-159, 187-209]. Their opinions are consistent with the many normal findings noted above.

(AR 24.)

Plaintiff argues the ALJ's reasoning is based on impermissible picking and choosing of medical evidence that supported her conclusion and failed to mention the significant objective findings that Dr. Joshi based his opinion on, such as: Plaintiff's abnormal EKGs and her cardiac workup, (AR 1807, 1858-63), and cites findings such as normal reflexes, normal strength, and normal gait, that are not relevant to Dr. Joshi's opinion which was based on limitations from the cardiac impairment. (Br. 26-27.) Further, Plaintiff argues the ALJ's reference to these findings are inaccurate because examination reports repeatedly indicated reduced muscle strength and 0+ reflexes in Plaintiff's ankles and her gait was abnormal, (AR 1260, 1263, 1266, 1269, 1272, 1276, 1280, 1284, 1288, 1642, 1646, 1649, 1654, 1658, 1662). (Br. 27.) Because the ALJ relied on selective entries in the treatment records and ignored others that supported Dr. Joshi's opinion, Plaintiff contends the ALJ's opinion is unsupported by objective evidence. (Br. 27.)

Plaintiff further argues the ALJ's reliance on the state agency physicians was error because in addition to the opinions of a non-examining physician is entitled to less weight than others, one of the state agency physicians was a pathologist (Specialty Code 31) and the other was an ophthalmologist (Specialty Code 28) (AR 177, 201, 233), Program Operations Systems Manual (POMS), DI 24501.004 (Medical Speciality Codes), and thus, even if they had examined or treated Plaintiff, the state agency opinions would deserve less weight than Dr. Joshi as a cardiologist, regarding the limitations caused by the cardiac disease, Garrison, 759 F.3d at 1013 (ALJ erred by failing to recognize that specialist's opinion was "owed greater weight as a matter of regulation," and by failing to afford "presumptively entitled" deference to treating physician's

[specialist's] opinion).  (Br. 27.)

Second, the state agency physicians did not review evidence of Plaintiff's cardiac impairment that was reviewed by Dr. Joshi, and therefore their opinions do not constitute substantial evidence to reject Dr. Joshi's opinion, and thus to the extent the ALJ's assessment of cardiac impairments was not based on the state physician opinions, it was based on the ALJ's erroneous lay review of the evidence.  (Br. 28.)  In this regard, Plaintiff highlights that: (1) the last treatment record reviewed by the agency relating to cardiac impairment was from March 2015 when Plaintiff presented to the ER after falling (AR 200), and thus evidence the ALJ reviewed without the assistance of a physician included numerous abnormal EKGs, a cardiac workup in February of 2016, a cardiac catherization in September of 2016, pacemaker lead replacements in January of 2017 and October of 2017, as well as diagnoses of symptomatic bradycardia in February of 2016, and atherosclerotic heart disease in July of 2016.  (Br. 28, AR 1466, 1807, 1762-64, 1785, 1794, 1863, 1901, 1903, 1984.)  Plaintiff argues Dr. Joshi's opinion of the significance of Plaintiff's cardiac disease trumps the ALJ's contrary interpretation, Jenkins v. Astrue, 628 F. Supp. 2d 1140, 1149 (C.D. Cal. 2009) ("It is axiomatic that as a treating physician and specialist in orthopedics, Dr. Frey's interpretation of her objective and clinical findings trumps a contrary interpretation based on nothing more than the ALJ's conflicting view of their significance"); Vaughn v. Berryhill, 242 F. Supp. 3d 998, 1009 (E.D. Cal. 2017) ("[g]iven the lack of a review of claimant's entire medical record by a physician after the opinions of Plaintiff's treating physicians were rejected, the Court is unable to affirm the ALJ's decision.").

3.   The ALJ's Weighing of the Dr. Joshi's Opinion is Supported by Substantial Evidence

Substantial evidence supports the ALJ's evaluation of all of the medical evidence of record, including evidence regarding Plaintiff's cardiac condition and Dr. Joshi's opinion, and the review of the state agency physician opinions.  While Plaintiff argues the ALJ impermissibly picked and chose from the evidence, the ALJ recognized and found that Plaintiff did suffer from severe cardiac impairments which supported some functional limitations, and the Court's review

1   of the ALJ's opinion and records cited to do not demonstrate that the ALJ ignored any significant

2   objective findings in the record.  (AR 18-26.)

3          The ALJ found Plaintiff had cardiac impairments of non-obstructive coronary heart

4   disease and status-post pacemaker placement, along with Chronic obstructive pulmonary disease,

5   which were severe but not disabling, and for example, the ALJ found the evidence accords with

6   Plaintiff's physical complaints, that she was hospitalized on several occasions for chest pain,

7   chest tightness, and heaviness, and shortness of breath.  (AR 22, 521, 594, 710, 874, 891, 971,

8   982, 1014-15, 1183, 1242-43.)  The ALJ noted a September 2013 catheterization study revealed

9   non-obstructive coronary heart disease, with vessels that were narrowed 30 to 40 percent (AR 22,

10  1079), and noted echocardiograms in 2013 and 2014 revealed positive but mild enlargement of

11  the left atrium and trace mitral and tricuspid regurgitation.  (AR 22-23, 1087, 1137.)[2]

12         Of particular significant to Plaintiff's arguments, the ALJ considered that Plaintiff had a

13  pacemaker implanted in November of 2014, with misfirings necessitating a new pacemaker in

14  2017.  (AR 23 ("She required a new pacemaker lead three years later when she felt that her

15  pacemaker was misfiring").)  The ALJ then acknowledged that thereafter, Plaintiff "continued to

16  complain of chronic chest pain, shortness of breath, and swelling her legs."  (AR 23.)  The ALJ

17  acknowledged Plaintiff's "[c]hronic chest discomfort and shortness of breath unquestionably can

18  restrict one's tolerance for activity, and therefore the medical evidence does establish that the

19  claimant's physical impairments limit her ability to work," however, "the evidence [did] not

20  establish that the claimant's limitations are debilitating."  (AR 23.)

21         The ALJ explained that although evidence established a severe coronary impairment,

22  there were "no diagnostic tests showing acute cardiopulmonary disease," and chest x-ray and CT

23  scans since 2011 were normal.  (AR 23.)  Such imaging studies showed normal heart size, clear

24  lungs, and no evidence of abnormalities.  Specifically, April 2012 x-rays showed no active chest

25

---

26  [2] April 20, 2014 results showed: (1) normal LV size with borderline systolic function with EF 50%; (2) normal
diastolic function; (3) mild left atrial enlargement; (4) trace MR/TR; (5) No AS/AI; (6) no pulmonary hypertension

27  detected; and (7) no pericardial effusion.  (AR 1087.)  October 22, 2013 results showed: (1) normal LV size with
borderline systolic function with EF 60%; (2) normal diastolic function; (3) normal biatrial size; (4) trace MR/TR;

28  (5) No AS/AI; (6) no pulmonary hypertension detected; (7) no pericardial effusion and (8) normal RV size and
systolic function.  (AR 1137.)

disease, heart contours normal, and no evidence of pleural fluid, pulmonary edema, or air space disease (AR 617), September 2012 x-rays showed clear lungs, normal heart size and pulmonary vascularity, aorta mediastinum and hilar regions within normal limits (AR 733), a September 2013 CT scan only referenced cysts (AR 696)[3], January 2013 x-rays of the chest showed heart size and pulmonary vascularity within normal limits and no acute cardiopulmonary disease (AR 550-51), an April 2014 CT scan noted no acute findings and "Specifically Negative for recurrence of right pericardial cyst or large central PE" (AR 1029), June 2014 x-rays found cardiac silhouette and pulmonary vascularity within normal limits, clear lungs, and no pleural effusion or pneumothorax (AR 1127), November 2014 x-rays noted no acute pulmonary disease, and cardiac silhouette within normal limits (AR 1155), March 2015 x-rays showed no definite acute pulmonary findings, stable appearance of cardiac silhouette, and left chest wall pacemaker device grossly stable (AR 1146), and July 2016 x-rays showed no evidence of vascular congestion, clear lungs, and normal cardiac silhouette (AR 1893).

Plaintiff highlights abnormal EKG results as discussed by the Court above.  (Br. 26 ("Plaintiff repeatedly sought treatment for severe chest pain and shortness of breath and her EKG results continued to be abnormal").)  Defendant states the "ALJ also pointed out that other than showing very mild ('trace') valve leaks ('regurgitation'), the EKGs indicated negative findings including, for example, normal pumping of blood ('ejection fraction'), sinus rhythm, and relaxation of the heart for blood to fill it ('diastolic function') (AR 23, 1087, 1137, 1807, 1844, 1918-19)."  (Opp'n 20.)  The Court notes that in one portion of the opinion, the ALJ only explicitly references the EKG results done in 2013 and 2014 that showed mild and trace abnormalities, and then in a subsequent portion states "EKGs have been negative except for the mild and trace findings noted above."  (AR 22-23.)  It appears the ALJ may have omitted reference to these subsequent abnormal EKG results cited by Plaintiff, however Plaintiff does not demonstrate how these EKG abnormalities differ in severity or other meaningful way from the

---

[3]  The impression report noted: "Nearly 4-year interval stability of a mediastinal cystic mass consistent with an incidental pericardial cyst or a mediastinal lymphangioma," and (2) "Two well-circumscribed low attenuation foci within the right lobe of the liver too small to definitively characterize very likely hepatic cysts without interval change compared to recent chest CT on 09/24/2012."  (AR 696.)

1   previous abnormal EKGs, as to comprise remandable error.  See Heller v. Comm'r of Soc. Sec.

2   Admin., No. CV-17-00243-TUC-DTF, 2018 WL 4377162, at *7 (D. Ariz. Sept. 14, 2018)

3   ("None of the medical records provide an explanation for the 'abnormal' result and also absent

4   from this after-acquired evidence is any analysis of the EKG/ECG data."), aff'd sub nom. Heller

5   v. Saul, 794 F. App'x 644 (9th Cir. 2020).[4]

6          The ALJ noted myocardial perfusion studies in April of 2014, and February of 2016

7   showed normal blood perfusion in all territories, with no restriction of blood supply to tissues

8   ("ischemia") or significant wall motion abnormalities.  (AR 23, 1127, 2009.)  The ALJ also

9   considered that a September 2016 catherization was negative.  (AR 23, 1784-85.)

10         As for Plaintiff's pulmonary issues, the ALJ cited records demonstrating Plaintiff's

11

---

12   [4]  Relatedly, in addition to the abnormal EKGs, Plaintiff argues that because the last treatment record reviewed by the agency relating to cardiac impairment is from March 2015, evidence the ALJ reviewed without the assistance of a state physician included a cardiac workup in February of 2016, a cardiac catherization in September of 2016, pacemaker lead replacements in January of 2017 and October of 2017, as well as diagnoses of symptomatic bradycardia in February of 2016 and atherosclerotic heart disease in July of 2016.  The Court notes that while the state physicians did not examine these later records, atherosclerotic coronary artery disease is listed under diagnoses in records as early as 2013 (AR 463-66), with the condition acknowledged in the review records of the state agency physicians (AR 149-50, 175-76); the ALJ noted Plaintiff suffered from nonobstructive coronary artery disease revealed by a September 2013 catheterization study, prior to the implantation of the pacemaker (AR 18, 22, 97, 508-10); state agency physicians recognized Plaintiff's claims and evidence of coronary artery disease with a pacemaker (AR 135-36); the ALJ found Plaintiff suffered from the severe impairment of bradycardia status-post pacemaker placement (AR 18); state physicians reviewed records relating to Plaintiff's pre-pacemaker bradycardia, as well as records relating to bradycardia following the implantation of the pacemaker (AR 149-150-152 (March 25, 2015 "bradycardia-sinoatrial node dysfunction"),174-175); and the ALJ recognized that a new pacemaker lead was required three years after the pacemaker was initially implanted due to a malfunction (AR 23).  Given all of the evidence of record reviewed by the ALJ, including the pattern of history and treatment pre and post-pacemaker implantation, as well as pre and post-pacemaker lead replacement due to malfunction, the Court cannot find the ALJ erred despite Plaintiff's arguments that the agency physicians did not review such later records highlighted by Plaintiff in briefing.  See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability."); Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) ("the ALJ is responsible for translating and incorporating clinical findings into a succinct RFC."); Shaibi v. Berryhill, 883 F.3d 1102, 1108 (9th Cir. 2017) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld . . . As we cannot say that the ALJ's interpretation of the available evidence was not rational, the ALJ's conclusions were supported by substantial evidence.");Heller, 2018 WL 4377162, at *5 ("There mere diagnosis of an impairment is not sufficient to sustain a finding of disability . . . The ALJ must consider evidence of functional limitations in formulating the RFC . . . Heller argues in her reply brief that the ALJ failed to consider her symptoms related to her cardiac and laryngospasm conditions in formulating the RFC.  However, the record reflects that the ALJ considered the functional limitations of Heller's cardiac and laryngospasm conditions in formulating the RFC."), aff'd sub nom. Heller v. Saul, 794 F. App'x 644 (9th Cir. 2020); Edgecomb v. Colvin, 671 Fed. Appx. 517, 518 (9th Cir. 2016) (unpublished) ("ALJ did not err in failing to mention" an MRI scan, but "even if he did, that failure was harmless" because "[i]t contains no information regarding [claimant's] functional limitations," instead "it provides information already accepted by the administrative law judge: that [claimant] has severe degenerative disc disease. The question is what functional limitations that disease places on his ability to work. The 2011 MRI does not answer that question.").  The Court further addresses the development of the administrative record, infra Section IV(B).

asthma and COPD were assessed as stable on medication.  (AR 23, 1101 (January 25, 2015: COPD was "stable" with instruction to continue on inhalers), 1310 (June 30, 2015: "breathing had improved after the inhalers"), 1471 (October 2, 2015: "Asthma – stable" on medication)). The ALJ highlighted that Plaintiff's lungs were clear and respirations unlabored on almost every physical examination since the alleged onset date, while also acknowledging that one September 2015 pulmonary function test indicated moderately severe airway disease, however, the medical provider deemed it unreliable because Plaintiff "refused to follow directions."  (AR 23, 1313-14.)  The ALJ further noted Plaintiff continued smoking although she was repeatedly advised to quit smoking.  (AR 23.)

Additionally, on examinations in 2013 to 2017, Plaintiff had normal heart sounds; clear lungs; normal extremities with no edema; normal gait or ability to walk heels and toes, without assistance; and normal strength, sensation, coordination, and reflexes, which the ALJ reasonably found was consistent with light work exertion.  (AR 23, 486-87, 874, 982, 1036, 1040, 1078-79, 1092, 1100, 1185, 1203, 1212, 1219, 1245, 1254, 1435, 1470, 1482, 1490, 1527, 1637-38, 1763, 1800-01, 1827, 1836-37, 1845-46, 1907 1912, 1918, 1933, 1943, 1983).

While acknowledging the treating position of Dr. Joshi, the ALJ found the opinion "inconsistent with the unremarkable results of chest imaging studies and EKGs since the alleged onset date and with the normal heart sounds clear lungs normal-appearing extremities normal sensation and reflexes normal strength and tone and normal gait that the claimants doctors consistently have documented in examinations."  (AR 24.)  The ALJ then found the "same evidence warrant[ed] giving significant weight to the opinions of State agency medical consultants L. Bobba M.D. and A. Khong M.D. who reviewed the record in July and December of 2015 respectively[, and] expressed the opinion that the claimant could perform light work that did not involve concentrated exposure to pulmonary irritants . . . Their opinions are consistent with the many normal findings noted above."  (AR 24, 151-52, 154-56, 201, 204-205).

While Plaintiff highlights reports of symptoms of chest pain and shortness of breath, abnormal EKG results, and reduced muscle strength (Pl.'s Br. 21-22), the Court finds the ALJ reasonably resolved the conflicts in the evidence to find that the record as a whole indicated

Plaintiff overall had clear lungs, normal heart, normal gait, strength, coordination, and sensation in the extremities.  The Court also finds the ALJ properly gave significant weight to the opinions of the State agency reviewing physicians Drs. Bobba and Khong.  The ALJ reasonably found that these physicians' conclusions were overall consistent with the record evidence, regardless of their areas of specialization, and appropriately found these opinions to be consistent with the many normal findings noted above, and properly relied on them to assess the RFC.  See 20 C.F.R. § 404.1527(c)(3)-(4) (the more a medical source presents medical signs to support her opinion, or the more consistent her opinion is with the overall record, the more weight the ALJ will give to that opinion); Chaudhry v. Astrue, 688 F.3d 661, 671 (9th Cir. 2012) (ALJ properly relied more on non-examining physician's opinion than examining physician's opinions to assess the claimant's RFC where the ALJ provided specific and legitimate reasons supported by substantial evidence to give less weight to the examining physician's opinion); Thomas, 278 F.3d at 957 (opinions of non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record); 20 C.F.R. § 404.1513a(b)(1) (ALJs must consider administrative medical findings by State agency medical or psychological consultants because they are highly qualified and experts in Social Security disability evaluation).

Further, as the Court finds in the next section, substantial evidence supports the ALJ's overall RFC assessment.

4.   Substantial Evidence Supports the ALJ's Overall RFC Assessment

In addition to properly determining Plaintiff's physical RFC, Defendant argues the ALJ properly found Plaintiff retained the physical and mental capacity to work.  The Court agrees.

A claimant's RFC is "the most [the claimant] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).  The RFC is "based on all the relevant evidence in [the] case record."  20 C.F.R. § 416.945(a)(1).  "The ALJ must consider a claimant's physical and mental abilities, § 416.920(b) and (c), as well as the total limiting effects caused by medically determinable impairments and the claimant's subjective experiences of pain, § 416.920(e)."  Garrison v. Colvin, 759 F.3d 995, 1011 (9th Cir. 2014).

1    The ALJ concluded her opinion finding: "In short, the clinical evidence of record shows

2 that the claimant's heart sounds are regular, her heart function has been good, her lungs generally

3 are clear, her respirations are unlabored, her musculoskeletal and neurological functioning are

4 unremarkable, and her cognition is intact.  This evidence will not support a determination that

5 the claimant is disabled."  (AR 24.)

6    Specifically, as for the mental RFC, the ALJ stated that Plaintiff sought and received

7 treatment for mental symptoms, "primarily medical management – for mental symptoms such as

8 low mood and energy, decreased concentration, flashbacks of traumatic events, insomnia,

9 nightmares, tension, irritability, fatigue, and occasional feelings of panic."  (AR 23-24.)  The

10 ALJ acknowledged that "such symptoms can affect concentration, understanding, and

11 persistence in tasks," but the evidence "fail[ed] to establish they have affected [Plaintiff's]

12 functioning to the extent that she is mentally incapacitated" or unable to perform at least

13 noncomplex and routine tasks.  (AR 21, 23-24.)

14    As the ALJ emphasized in findings: Plaintiff reported to treatment providers that the

15 medications stabilized her mood and made her less anxious and depressed (AR 24, 1688, 1692);

16 Plaintiff's mental health exams included findings of fluent and coherent speech; calm and

17 cooperative behavior; organized and logical thoughts; average intelligence; normal mood; and

18 intact memory, attention, and judgment.  (AR 24, 903 (February 10, 2015), 1688 (May 27,

19 2016), 1692 (March 15, 2016), 1695 (March 1, 2016), 1698 (November 13, 2015), 1700-01

20 (September 4, 2015), 1702 (June 26, 2015), 1704-05 (April 27, 2015).)  The ALJ further noted

21 Plaintiff's psychological presentation in medical examinations has likewise been normal.  (AR

22 24, 874 (June 27, 2014: alert and oriented), 891 (June 11, 2013: depression was stable, Plaintiff

23 denied thoughts of self-harm), 971 (June 21, 2013: no distress), 982 (October 19, 2013: no

24 distress), 1036 (June 21, 2014: normal speech), 1092 (January 10, 2015: no distress), 1311 (June

25 30, 2015: cooperative, appropriate mood and affect), 1490 (August 21, 2014: normal psychiatric

26 examination, diagnoses of anxiety, bipolar disorder), 1800-02 (July 8-9, 2016: long history of

27 anxiety disorder controlled on Xanax), 1836-37 (March 8, 2016: normal mood, affect, behavior,

28 thought content, and judgment), 1933 (October 19, 2016: denied memory loss).)

1    State agency psychologist Dr. Davis reviewed the record in July of 2015 and opined that

2    Plaintiff's mental impairments moderately limited her ability to concentrate and stay on task but

3    that she could nevertheless perform simple routine work, and State consultant psychiatrist Dr.

4    Loomis reviewed the record in November of 2015 and concurred with that opinion.  (AR 25,

5    151, 156-57, 200-01, 202, 205-207.)  The ALJ found both of these opinions found "support in

6    the claimant's symptomology, her consistently unremarkable mental-status in examinations, and

7    her positive response to medication," and accordingly assigned the opinions great weight.  (AR

8    25, 901-934, 1684-1705.)

9    The Court finds the ALJ's explanation that such opinions were supported by Plaintiff's

10   unremarkable mental status examinations and evidence of positive response to medication

11   treatment, are adequately and reasonably supported by substantial evidence in the record.  (AR

12   874, 891, 903, 971, 982, 1036, 1092, 1311, 1490, 1688, 1692, 1695, 1698, 1700-01, 1702, 1704-

13   05, 1800-02, 1836-37, 1933.)

14   Relatedly, and as relevant to Plaintiff's argument below that the ALJ failed to develop the

15   administrative record, Defendant also argues the ALJ properly gave less weight to treating

16   psychiatrist Dr. Balos's opinion.

17   The ALJ noted that in a September 2015 "check-the-box mental assessment, treating

18   psychiatrist John Balos, M.D., indicated that the claimants mental impairments affected her

19   memory and judgment and 'significantly' affected her concentration [and] that deficits in the

20   claimant's general appearance, history, social functioning, and adaptability would impair her

21   ability to work; that poor sleep and nightmares rendered her unable to function during the day;

22   and that the claimant's mental status was not expected to improve within the following year."

23   (AR 25, 1664-65.)  The ALJ found that while the evidence showed Plaintiff's mental and

24   physical impairments could be distracting, it did not establish that Plaintiff's concentration was

25   affected more than moderately, and found Dr. Balos' opinion to be inconsistent with the normal

26   appearance, thought processes, thought content, intelligence, speech, and behavior Plaintiff

27   exhibited in mental-health examinations over a period of years.  (AR 25.)

28   The Court finds the ALJ's reasons given for discounting Dr. Balos' opinion are specific

1  and legitimate, and adequately and reasonably supported by substantial evidence in the record.

2       Accordingly for all of the reasons discussed in this section and the previous, the Court

3  finds the ALJ properly considered the medical and other evidence of record, and there is

4  substantial evidence in the record to support the finding that Plaintiff has the residual functional

5  capacity to perform light work with the following limitations: can lift and carry 20 pounds

6  occasionally and 10 pounds frequently; can sit, stand, and walk six hours in an eight-hour

7  workday; must avoid concentrated exposure to pulmonary irritants such as dusts, gases, and

8  fumes; can occasionally climb ladders, ropes, scaffolds, and can occasionally balance; cannot

9  work at heights; and is mentally limited to noncomplex and routine tasks.  (AR 21-26.)  The

10  Court finds that there is substantial evidence in the record to support the ALJ's residual

11  functional capacity findings.

12       **B.**    **Development of the Administrative Record**

13       Plaintiff argues that the ALJ failed to properly develop the administrative record and if

14  the action is not remanded based on Dr. Joshi's opinion, it should be remanded for further

15  administrative proceedings to correct the ALJ's errors and further develop the record.  (Br. 29.)

16       The claimant generally has the duty to provide the agency with evidence proving that

17  they are disabled.  See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); 42 U.S.C. §

18  423(d)(5)(A) ("An individual shall not be considered to be under disability unless he furnishes

19  such medical and other evidence of the existence thereof").  In making a determination, the

20  agency "shall consider all evidence available in such individual's case record . . . shall develop a

21  complete medical history of at least the preceding twelve months," and "shall make every

22  reasonable effort to obtain from the individual's treating physician (or other treating health care

23  provider) all medical evidence, including diagnostic tests, necessary in order to properly make

24  such determination, prior to evaluating medical evidence obtained from any other source on a

25  consultative basis."  42 U.S.C. § 423(c)(5)(B).

26       The ALJ has "a special duty to fully and fairly develop the record and to assure that the

27  claimant's interests are considered."  Widmark v. Barnhart, 454 F.3d 1063, 1068 (9th Cir. 2006)

28  (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)).  The ALJ must be especially

diligent when the claimant is unrepresented.  Widmark, 454 F.3d at 1068; McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011).  The "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  Mayes, 276 F.3d 453 at 459-60 (citing Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001)).  A specific finding of ambiguity or inadequacy in the record is not required to trigger the necessity to further develop the record where the record itself establishes the ambiguity or inadequacy.  McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011).

The ALJ has broad discretion in deciding whether a consultative examination is required. See Reed v. Massanari, 270 F.3d 838, 842 (9th Cir. 2001) ("Within this regulatory framework, the Commissioner 'has broad latitude in ordering a consultative examination.' ") (quoting Diaz v. Sec'y of Health and Human Servs., 898 F.2d 774, 778 (10th Cir. 1990)); Jenkins v. Colvin, No. EDCV 14-1796-JPR, 2015 WL 4208517, at *5 (C.D. Cal. July 10, 2015).   Under the regulations, "[t]he decision to purchase a consultative examination will be made on an individual case basis in accordance with the provisions of §§ 404.1519a through 404.1519f."  20 C.F.R. § 404.1519.  If the agency cannot get the information it needs from the claimant's medical sources, the agency "may decide to purchase a consultative examination.  20 C.F.R. § 404.1519a(a). "Before purchasing a consultative examination, [the agency is to] consider not only existing medical reports, but also the disability interview form containing [the claimant's] allegations as well as other pertinent evidence in [the claimant's] file."  Id.

The agency "may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on" the claim.  20 C.F.R. § 404.1519a(a).  The regulations provide the following examples of when the agency "might purchase a consultative examination to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis," including: "(1) The additional evidence needed is not contained in the records of [the claimant's] medical sources; (2) The evidence that may have been available from [the claimant's] treating or other medical sources cannot be obtained for reasons beyond [the claimant's] control, such as death or noncooperation of a medical source; (3) Highly technical or specialized medical

1   evidence that [the agency] need[s] is not available from [the claimant's] treating or other medical

2   sources; or (4) There is an indication of a change in [the claimant's] condition that is likely to

3   affect [the claimant's] ability to work, but the current severity of [the claimant's] impairment is

4   not established."  20 C.F.R. § 404.1519a(b)(1)-(4).

5       Specifically, Plaintiff emphasizes that no consultative examinations were performed in

6   this case, and instead, the ALJ based her RFC on the opinions of reviewing physicians who only

7   partially reviewed the record.  (Br. 30.)  Plaintiff contends this is error because the ALJ's duty to

8   develop the record was triggered by objective evidence of multiple impairments aside from her

9   cardiac disease, including osteoarthritis and Baker's cysts in her knees, peripheral neuropathy,

10  cervical spondylosis (degenerative changes), moderately severe chronic obstructive pulmonary

11  disease, liver disease and a uterine prolapse, for which Plaintiff underwent surgery for in July of

12  2015 (AR 1261, 1276, 1314, 1321, 1637, 1669, 1672).  (Br. 30.)  Plaintiff highlights

13  examinations showing abnormal gait, reduced muscle strength and reflexes in both ankles, and

14  argues this evidence triggered the duty to develop the record.

15      As for Plaintiff's mental impairments, Plaintiff argues the ALJ rejected the opinion of

16  Plaintiff's treating psychiatrist, Dr. Balog, based on selective reliance of evidence that "showed

17  normal appearance, thought content, intelligence, speech, and behavior."  (AR 25.)  Plaintiff

18  argues the ALJ silently disregarded evidence that showed Plaintiff was defensive, her speech was

19  pressured or rambling, her judgment and insight were not appropriate, she was depressed and

20  anxious, she was confused, her affect was depressed and tearful, and her conversation was

21  chaotic (AR 918, 996, 1010, 1012, 1023, 1091-93, 1688).  (Br. 31.)  Dr. Balog observed Plaintiff

22  had issues with affective stability, including depressive symptoms and anxiety (AR 1704).

23  Plaintiff argues that the ALJ's selective reliance on evidence that indicated no mental

24  abnormalities renders the ALJ's rejection of Dr. Balog's opinion unsupported by substantial

25  evidence, and therefore Dr. Balog's opinion should be credited on remand,[5] or alternatively, the

26  ALJ should be directed to obtain Plaintiff's therapy records, as Plaintiff states that although the

27

28  [5]  Plaintiff raises this argument for the first time in briefing in the section relating to development of the
administrative record.  (Br. 30-31.)

record indicates Plaintiff underwent psychotherapy, the only records in the transcript relating to her mental health treatment are medication management records of her psychiatrists (AR 76, 355, 394-95, 914-15) and direct an examination review by a psychiatrist or psychologist.

The Court agrees with Defendant that given the ALJ's duty to further develop the record is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence, the ALJ properly found the record sufficient to make a determination of Plaintiff's disability.  (AR 15-28.)  It is the Plaintiff's burden to prove disability and as discussed above, the ALJ's RFC determination was based on substantial evidence in the record.  The Court finds no apparent indication that the agency or ALJ failed to adequately elicit and receive medical evidence from Plaintiff's treating sources.   The Court notes that the administrative record is 2,020 pages long, and documents Plaintiff's frequent visits to the emergency room and medical evaluations for various complaints.  (AR 454-2020.)  Given the agency's broad discretion in deciding whether to order a consultative exam, the Court finds no error in the decision not to do so.  See Jenkins v. Colvin, No. EDCV 14-1796-JPR, 2015 WL 4208517, at *5 (C.D. Cal. July 10, 2015) (ALJ did not err in not ordering consultative exam); Leitner v. Comm'r Soc. Sec. Admin., 361 F. App'x 876, 877 (9th Cir. 2010) (finding no duty to send claimant to consultative exam before finding impairment not severe because record was neither ambiguous nor inadequate).   Further, Plaintiff was represented by counsel at the administrative hearing and Appeals Council stages and had the opportunity to provide more evidence, with the ALJ specifically keeping the record open for the attorney to submit radiology reports.  (AR 1-4, 64, 106-107.)  Plaintiff submitted a request for review of the ALJ's decision without submitting additional evidence.  See Jenkins, 2015 WL 4208517, at *5 ("Plaintiff could have submitted additional records to the Appeals Council but did not.").

Accordingly, the Court finds the ALJ did not err in failing to further develop the record.

### C.    The ALJ's Consideration of the Lay Witness Evidence

Plaintiff argues the ALJ erred in failing to give legally adequate reasons for rejecting the statements of Plaintiff, her daughter, and her mother.  (Br. 31.)

///

1           1.     Plaintiff's Testimony

2          "An ALJ is not required to believe every allegation of disabling pain or other non-

3  exertional impairment."  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation

4  and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or

5  symptoms is credible, requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674

6  F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented

7  objective medical evidence of an underlying impairment which could reasonably be expected to

8  produce the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th

9  Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to

10 show that her impairment could be expected to cause the severity of the symptoms that are

11 alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen, 80

12 F.3d at 1282.

13         Second, if the first test is met and there is no evidence of malingering, the ALJ can only

14 reject the claimant's testimony regarding the severity of her symptoms by offering "clear and

15 convincing reasons" for the adverse credibility finding.  Carmickle v. Commissioner of Social

16 Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must specifically make findings that

17 support this conclusion and the findings must be sufficiently specific to allow a reviewing court

18 to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not

19 arbitrarily discredit the claimant's testimony.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir.

20 2004) (internal punctuation and citations omitted).

21         Factors that may be considered in assessing a claimant's subjective pain and symptom

22 testimony include the claimant's daily activities; the location, duration, intensity and frequency

23 of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage,

24 effectiveness or side effects of any medication; other measures or treatment used for relief;

25 functional restrictions; and other relevant factors.  Lingenfelter, 504 F.3d at 1040; Thomas, 278

26 F.3d at 958.  In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary

27 techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent

28 statements concerning the symptoms, and other testimony by the claimant that appears less than

1   candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a

2   prescribed course of treatment. . . ."   Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008)

3   (quoting Smolen, 80 F.3d at 1284).

4        Plaintiff emphasizes testimony that a four wheel walker had been prescribed for her in

5   2013 and again in 2014, that she was still using the walker in 2014 (AR 71-73), that testimony is

6   supported by treatment records (AR 1003, 1050), that she testified she fell even when using a

7   walker (AR 73), and that testimony that her medications caused debilitating side effects, such as

8   dizziness and nausea, is also supported by the record (AR 79-80, 1268, 1636, 1645, 1830).

9   Plaintiff proffers that the ALJ largely rejected Plaintiff's testimony based on her summary of the

10  medical evidence (AR 22-26), and the Ninth Circuit has expressed disapproval of an ALJ's

11  reliance on a summary of the medical evidence as support for credibility findings, and in any

12  event, Plaintiff was not required to produce objective medical evidence that supported the

13  existence and severity of her disabling symptoms, but only evidence only of an underlying

14  impairment that could reasonably be expected to cause her pain and other symptoms.

15       Specifically, Plaintiff claims the ALJ's summary of the medical evidence contains two

16  references to Plaintiff's testimony which are both inaccurate: (1) the ALJ's finding that

17  Plaintiff's testimony that she needed a walker to ambulate was contradicted by the record that

18  showed her gait, strength, and reflexes were normal (AR 23) is contradicted by records showing

19  abnormal gait, and abnormal strength and reflexes in the ankles, and Plaintiff's cardiologist's

20  prescription of a walker confirms her testimony; and (2) The ALJ's finding that Plaintiff's

21  complaints had not prompted her to stop smoking, "thereby implying she did not want to get

22  better . . . is contradicted by her testimony that she had been in a program to stop smoking for the

23  past year and smoked only five cigarettes a day."  (Br. 32-33.)

24       Defendant argues that the ALJ did not ignore Plaintiff's statements but rather properly

25  considered them under the regulations, and accorded them weight to the extent they could

26  reasonably be accepted as consistent with the objective medical evidence and other evidence of

27  record.   (Opp'n 26.)   Defendant emphasizes the following of Plaintiff's allegations of

28  impairment that the ALJ acknowledged in the opinion: (1) Plaintiff alleged that her heart and

1   lung impairments caused constant chest pain, shortness of breath, fatigue, feelings of weakness

2   and imbalance, and exercise intolerance, and that these symptoms restricted her daily activities

3   (AR 22, 72-100, 382-389); (2) Plaintiff claimed that she could not take a deep breath without

4   experiencing severe pain (AR 22, 78); (3) Plaintiff claimed that she required a walker for balance

5   and stability and often fell despite the use of an assistive device (AR 22, 71-83, 382-389); (4)

6   Plaintiff said she could not remain standing or do any household chores for more than five

7   minutes at a time; and could not lift even 10 pounds (AR 22, 84, 387); (5) Plaintiff rarely cooked

8   and needed assistance with basic daily tasks including bathing, grooming, and dressing herself

9   (AR 22, 73-84, 382-389); (6) Plaintiff claimed to experience constant discomfort which affected

10  her squatting, bending, reaching, sitting, kneeling, and climbing stairs (AR 22, 382-389); (7)

11  Plaintiff said her physical symptoms triggered and worsened her mental disorder symptoms such

12  as forgetfulness, very short attention span, inability to follow instructions and complete tasks,

13  irritability, self-isolation, extreme anxiety in public places, stress intolerance, multiple daily

14  crying spells, anxiety attacks, poor adaptability, and hypervigilance (AR 22, 88-89, 382-389); (8)

15  Plaintiff stated that on a typical day, she could do little more than crochet while sitting or

16  reclining with her legs elevated (AR 22, 80-89); (9) Plaintiff testified she took medications to

17  manage her physical and mental symptoms, they provided limited relief, and they caused

18  unpleasant side effects such as vomiting, diarrhea, and dizziness (AR 22, 79-80, 382-389).

19  (Opp'n 27.)

20      Defendant argues that the ALJ provided at least four compelling reasons for finding

21  Plaintiff's subjective allegations of disabling symptoms to be inconsistent with the record

22  overall, any one of which, provides substantial evidence to support the ALJ's assessment of the

23  subjective allegations (AR 16-26).   (Opp'n 27.)   The Court considers each of Defendant's

24  specific arguments.   Plaintiff's specific arguments concerning the ALJ's comments on quitting

25  smoking and use of an assistive walker are addressed in Subsection (b) below.

26      **a.      The ALJ Properly Found a Lack of Objective Medical Evidence**

27      Defendant argues the ALJ noted a lack of objective medical support for Plaintiff's

28

1   allegations as required by the relevant regulations.  (Br. 27-28.)[6]

2        While the Court will not rehash the same evidence of record discussed above, <u>supra</u>

3   Sections IV(A)(3)-(4), citing essentially the same records, Defendant argues the ALJ noted

4   clinical evidence showed Plaintiff's heart sounds and function were repeatedly normal on exam,

5   her lungs were generally clear, respirations were unlabored, her musculoskeletal and

6   neurological functioning were unremarkable, and her cognition was intact (AR 24); there was no

7   evidence of acute cardiopulmonary disease – imaging of the chest since 2011 were normal,

8   showing normal heart size, clear lungs, and no evidence of any significant abnormalities; other

9   than showing very mild valve leaks, heart studies indicated negative findings including normal

10  pumping of blood, sinus rhythm, and blood flow; on physical examination, Plaintiff often and

11  consistently had normal heart sounds and clear lungs, as well as normal extremities with no

12  edema; normal gait or ability to walk at least on heels and toes, without assistance; and normal

13  strength, sensation, coordination, and reflexes.  (Opp'n 28.)

14       Further, Defendant argues that aside from some episodes of engaging in self-harming

15  behavior due to alcohol abuse in 2013 and 2014, Plaintiff presented with no significant mental

16  deficits, and stopped drinking alcohol in 2014 (AR 19, 461-66, 641, 667, 909, 995).  (Opp'n 28.)

17  Further, mental status examinations during her mental health treatment were overall normal,

18  including findings of fluent and coherent speech; calm and cooperative behavior; organized and

19  logical thoughts; average intelligence; normal mood; and intact memory, attention, and

20  judgment.  (Opp'n 29.)  Mental status examinations during medical visits were also normal (AR

21  24, 874, 891, 971, 982, 1036, 1092, 1311, 1490, 1800-1802, 1836-37, 1933).

22       Defendant also argues that Plaintiff's claims of disabling vomiting and diarrhea, allegedly

23

---

24  [6]  Here the Court notes that Defendant cites to a non-existent quotation from the ALJ.  Defendant cites AR 35
    proffering the ALJ said: "Based on this evidence, the undersigned finds that the claimant's subjective allegations are
25  inconsistent with the medical evidence and other evidence in the record."  (Br. 27.)  However, the ALJ's opinion
    ends on AR 28, and no such quotation appears.  However, the ALJ did make a comparably similar statement and
26  thus the principle of Defendant's argument stands for consideration.  Specifically, the ALJ stated: "In sum I find that
    the claimant's subjective allegations and the objective medical evidence support a finding that her impairments
27  cause some limitations in her ability to perform work-related activity.  However I further find that the record as a
    whole the medical evidence the opinion evidence and the claimants allegations and testimony-supports a finding that
28  the claimant retains the ability to perform work activity within the limitations described in the residual functional
    capacity assessment."  (AR 26.)

1  a possible medication side effect, are not supported by the evidence, addressed by the ALJ when

2  she noted Plaintiff's bowel sounds were normal and her abdomen was normal on examination,

3  and cited abdominal imaging studies and EGDs that were negative for any acute gastrointestinal

4  condition.   (AR 19, 1219, 1482, 1561-62, 1667-1669, 1675-1682, 1712, 1845-1846, 1918.)

5  Finally as to claims of peripheral neuropathy affecting her ability to walk or stand, the ALJ noted

6  that the evidence indicated Plaintiff's neuropathy was only mild in nature.   (AR 18-19, 1263-

7  1289, 1653-1663, 2016-2017.)

8        Based on the foregoing, the Court finds the ALJ reasonably found Plaintiff's allegations

9  of disabling physical or mental impairments was inconsistent with the record of objective clinical

10  evidence.   Even if considered only making a credibility determination based on a lack of medical

11  evidence in the record, the Court finds these were clear and convincing reasons supported by

12  substantial evidence when considered in conjunction with the ALJ's reasoning discussed in the

13  following subsections, which provides additional support for the appropriateness of the ALJ's

14  credibility determination.   See Burch v. Barnhart, 400 F.3d 676, 680-81 (9th Cir. 2005)

15  ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony,

16  it is a factor that the ALJ can consider in his credibility analysis . . . Contrary to Burch's

17  argument, the ALJ did not solely rely on the minimal objective evidence and Burch's daily

18  activities in discrediting her testimony.   Indeed, these factors were among those he relied on,

19  however, the ALJ made additional specific findings to support his credibility determination.");

20  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) ("The fact that a claimant's testimony is

21  not fully corroborated by the objective medical findings, in and of itself, is not a clear and

22  convincing reason for rejecting it.").

23        **b.     Conservative Treatment and Continued Smoking**

24        Defendant argues the ALJ properly found Plaintiff's conservative course of treatment

25  which appeared to control her symptoms, as well as her continued smoking, belied her claims of

26  disabling physical complaints and mental complaints.   (AR 18-26.)   The ALJ noted Plaintiff's

27  shortness of breath and COPD were controlled on inhalers (AR 23, 1101 (January 25, 2015:

28  COPD was "stable" with instructions to continue on inhalers), 1310 (June 30, 2015: "breathing

1  had improved after the inhalers"), 1471 (October 2, 2015: "Asthma – stable" on medication)).

2  Despite a history of and complaints of shortness of breath and heart issues, Plaintiff continued to

3  smoke five cigarettes per day.  (AR 23, 78-79, 86, 570-869, 1636-1663, 1718-1752).  As further

4  noted by the ALJ, treatment providers repeatedly advised her to exercise at least 30 to 40

5  minutes per day.  (AR 23, 1436, 1638, 1764, 1908, 1912, 1933, 1984, 1918.)

6      The Court addresses Plaintiff's specific arguments concerning smoking and use of a

7  walker here because the ALJ noticeably combined these findings in the same section.

8  Specifically, after noting COPD was stable, normal heart sounds, clear lungs and respirations,

9  and being free from edema, the ALJ specifically stated: "Contrary to the claimant's testimony

10  that she required a walker to ambulate, her providers have repeatedly found that her gait,

11  strength, sensation, coordination, and reflexes are normal.  They also have repeatedly advised her

12  to exercise at least 30 to 40 minutes a day . . . [and] [n]otably, the claimant's cardiopulmonary

13  complaints have not prompted her to stop smoking, despite many admonitions to quit in the

14  seven years since the alleged onset date."  (AR 23.)

15      Plaintiff argues the ALJ's comments regarding the walker are error and emphasizes

16  testimony that a four wheel walker had been prescribed for her in 2013 and again in 2014, that

17  she was still using the walker in 2014 (AR 71-73), and that such testimony that is supported by

18  treatment records (AR 1003, 1050).  First, however, the Court finds the treatment records cited

19  by Plaintiff as supporting Plaintiff's testimony concerning the need for a walker are not overly

20  convincing as to counter the ALJ's comments.[7]  The ALJ's statement only notes that there is

21

22  [7]  The first record cited by Plaintiff here is an October of 2013 record of a physical therapy initial assessment
   following surgery, noting Plaintiff got "up and ambulated hallway, with a few rest breaks secondary to pain at

23  surgical site . . . does hold the rail, as she takes a rest . . . stated, she might feel better with a FWW at home.  This
   can be determined at discharge if pt continues to feel safer with equipment."  (AR 1003.)  Discharge notes stated:
   "Pt asking for FWW and tub bench for shower because she falls at times at home.  Pt strongly feels the need because

24  her daughter assists her and is unable to lift PT explained to pt as she was ambulating hallway that she should not
   require lifting because of her good mobility.  Pt states she's on "a lot of drugs" which makes her fall at times."  (Id.)

25  The second record cited by Plaintiff here is a November of 2014 record of a physical therapy initial assessment
   noting: "Patient relates falls and near falls associated with decreased balance.  Per PCA, she has been ambulating

26  independently to the bathroom.  When ambulating with PT she intermittently looses [sic] balance backward.
   Standing with eyes closed results in increased instability.  Patient instructed in standing exercises with walker next

27  to bed for balance: shallow squats, weight shifts and toe rises.  Would benefit from HHPT and HHRN assessments
   for safety as well as 4 wheeled walker with seat to allow for progressive ambulatory distance to improve endurance
   and safety.  Acute PT singing off. Potential For Improvement : Good."  (AR 1050.)

28

1  evidence in the record countering Plaintiff's claims of needing a walker, not that Plaintiff was

2  never prescribed a walker or that there was no evidence that she did need a walker, and it is the

3  ALJ's duty to weigh conflicting evidence.  Further, the ALJ's statement regarding the walker

4  was made in conjunction with her related observations that doctors had repeatedly advised

5  Plaintiff to exercise thirty to forty minutes a day, and Plaintiff's testimony that she still continued

6  to smoke despite warnings from medical providers since the alleged onset date.  (AR 23.)

7          The Court finds the ALJ's discussion regarding the stability of Plaintiff's COPD, normal

8  physical examinations, use of a walker, advisement to exercise daily, and Plaintiff's failure to

9  quit smoking, are clear and convincing reasons for rejecting Plaintiff's subjective pain testimony.

10  See Moisa, 367 F.3d at 885; Lingenfelter, 504 F.3d at 1040; Thomas, 278 F.3d at 958.

11  Tommasetti, 533 F.3d at 1039.

12          **c.      Inconsistency with Medical Opinions**

13          Defendant argues the ALJ properly considered the opinions of the State agency reviewing

14  physicians Drs. Bobba and Khong, who found that Plaintiff was not physically disabled and

15  instead could perform light work with some environmental restrictions (AR 24, 151-152, 154-

16  156, 201, 204-205).  Defendant argues the ALJ further properly found Plaintiff's claim of

17  disabling mental symptoms to be contradicted by State agency reviewing psychologist Dr. Davis,

18  and psychiatrist Dr. Loomis opined that Plaintiff could perform at least simple, routine work (AR

19  25, 151, 156-157, 200-201, 202, 205-207).

20          When considered with the reasons discussed in the previous two subsections and

21  following subsection, the Court finds the state agency medical opinions are clear and convincing

22  reasons for rejecting the claimant's testimony.  See Moncada v. Chater, 60 F.3d 521, 524 (9th

23  Cir. 1995) (in evaluating a claimant's subjective statements, an ALJ may consider daily

24  activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain

25  medication, and relevant character evidence, and holding the ALJ gave valid specific reasons

26  where a doctor "believed that Moncada could do sedentary work, that Moncada said that he uses

27  pain medication infrequently, and that Moncada's testimony about his daily living activities were

28  much more limited than those reported in a disability report completed by him prior to his

1 testimony.").

2       **d.      Plaintiff's Admitted Daily Activities**

3       Defendant argues that the ALJ noted Plaintiff's admitted activities were inconsistent with

4 the allegations of disability (AR 16-26), and it was reasonable for the ALJ to find that even

5 though limited in her activities, Plaintiff nevertheless was likely not completely precluded from

6 performing work activities if she could perform her admitted activities including crocheting,

7 which required focus for at least 30 minutes at a time, and ability to sit; self-care and hygiene

8 such as showering and dressing with minimal assistance; chores like laundry, grocery shopping,

9 and preparing food for herself.  (AR 20, 71, 73-74, 77, 80-89.)  Defendant argues that while

10 Plaintiff may have demonstrated some difficulty in performing tasks, the ALJ properly weighed

11 her activities and statements with the overall evidence, when deciding whether she was as

12 restricted as alleged.

13       There are two grounds to use daily activities for an adverse credibility finding.  Orn v.

14 Astrue, 495 F.3d 625, 639 (9th Cir. 2007).  First, daily activities can form the basis of an adverse

15 credibility determination if the claimant's activity contradicts his testimony.  Orn, 495 F.3d at

16 639.  Secondly, "daily activities may be grounds for an adverse credibility finding 'if a claimant

17 is able to spend a substantial part of his day engaged in pursuits involving the performance of

18 physical functions that are transferable to a work setting.' "  Id. (quoting Fair v. Bowen, 885 F.2d

19 597, 603 (9th Cir. 1989)).  The ALJ must make specific findings as to the daily activities and

20 their transferability to conclude that the claimant's daily activities warrant an adverse credibility

21 determination.  Orn, 495 F.3d at 639.  "[T]he mere fact that a plaintiff has carried on certain

22 daily activities . . . does not in any way detract from her credibility as to her overall disability."

23 Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (citing Vertigan v. Halter, 260 F.3d 1044, 1050

24 (9th Cir. 2001)).

25       Specifically, the ALJ noted that:

26       In understanding, remembering, or applying information, the claimant has a
        moderate limitation.  She alleges her memory is poor and she can no longer
27      follow instructions.  Nevertheless she accomplishes daily living activities such as
        shopping for necessities, preparing simple meals, light cleaning and laundry.  She
28      can use public transportation.  She enjoys crocheting and she does that activity

1

2

3

> regularly.  Additionally the medical evidence shows that the claimant is able to provide information about her health and treatment history answer questions and follow instructions from healthcare providers and comply with treatment.  The claimant's medical records do not indicate that any provider has noted obvious problems with her memory intelligence or judgment . . .

4

5

6

7

> . . . With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation.  She alleges that her attention span is extremely short, and that she does not finish what she starts.  However, as noted above, she does accomplish her daily living activities.  The claimant's mental-health progress notes show that her thought content and thought processes are normal.  There is no evidence that any doctor has observed the claimant to have obvious or persistent problems with distractibility.

8

(AR 20-21.)

9

10

Plaintiff did not mount a specific challenge to any of the ALJ's findings or comments

11

regarding daily activities.  The Court finds the ALJ's rejection of certain of Plaintiff's testimony

12

based on testimony of daily activities is a clear and convincing reason based on substantial

13

evidence, particularly when considered in conjunction with the ALJ's overall credibility analysis

discussed in the previous subsections.

14

      2.     The Lay Testimony of Plaintiff's Mother and Daughter

15

16

"In determining whether a claimant is disabled, an ALJ must consider lay witness

17

testimony concerning a claimant's ability to work."  Stout v. Commissioner, Social Sec. Admin.,

18

454 F.3d 1050, 1053 (9th Cir. 2006); 20 C.F.R. § 404.1513(b)(4).  "Lay witness testimony is

19

competent evidence and cannot be disregarded without comment."  Bruce v. Astrue, 557 F.3d

20

1113, 1115 (9th Cir. 2009) (quoting Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)).

21

The ALJ must give specific reasons germane to the witness in discounting the lay witness

22

testimony.  Stout, 454 F.3d at 1056.  ).  If the ALJ gives reasons for rejecting the claimant's

23

testimony that are equally relevant to similar testimony provided by lay witnesses, that would

24

support a finding that the lay witness testimony is similarly not credible.  Molina v. Astrue, 674

25

F.3d 1104, 1114 (9th Cir. 2012).  An ALJ may reject lay witness testimony that conflicts with

26

the medical evidence.  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001); Bayliss v. Barnhart,

27

427 F.3d 1211, 1218 (9th Cir. 2005); Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

28

1984).Inconsistency with medical evidence and activities of daily living are germane reasons for

1   discrediting lay witness testimony.  Bayliss, 427 F.3d at 1218.

2       Plaintiff argues the ALJ failed to provide specific reasons germane to Plaintiff's daughter

3   and mother for rejecting their testimony.  (Br. 33.)  Specifically, Plaintiff argues the daughter,

4   Karen's, testimony is especially probative because she lived with Plaintiff and took care of her,

5   Dodrill v. Shalala, 12 F.3d 915, 918-19 (9th Cir. 1993) ("[F]riends and family members in a

6   position to observe a claimant's symptoms and daily activities are competent to testify as to her

7   condition."), and Karen stated Plaintiff's medications caused her to sleep too much; that she fell

8   often, and needed reminders to do everything, including showering and taking medications, and

9   that Plaintiff could not do anything by herself.  (Br. 33; AR 369-75.)  Plaintiff highlights that the

10  ALJ rejected the statements of Karen and her mother because "[f]or the reasons explained

11  above," the medical evidence did not support Plaintiff's allegations (AR 25).  Plaintiff argues

12  this reason fails because the ALJ's reasons for rejecting the Plaintiff's testimony were

13  inadequate, and furthermore, this reason is not germane to either Plaintiff's daughter or her

14  mother.  The ALJ Further rejected their statements because they had no medical training (AR

15  26), and this "finding defeats the very purpose of obtaining statements that describe a third

16  party's observations of a claimant," as "Lay witnesses are not required to indicate whether their

17  observations of the claimant's behavior stem from medically necessary limitations, as this would

18  run counter to the purpose of considering lay testimony," Aho v. Berryhill, No. 17-35554 (9th

19  Cir. March 29, 2019) (unpublished) (citing Bruce v. Astrue, 557 F.3d 1114, 1116 (9th Cir.

20  2009)) (ALJ erred when rejecting 3rd party testimony because 3rd party was not in a position to

21  identify whether limitations were "medically necessary").  (Br. 33-34.)

22      Defendant argues the ALJ properly accorded little weight to the third party function

23  reports for the reasons she provided when discounting Plaintiff's allegations- that is because of

24  "many unremarkable objective physical and mental findings are inconsistent with [Plaintiff's]

25  allegation that she is incapable of per[for]ming any work" (AR 25).  Defendant argues the ALJ

26  "also properly rejected the witnesses' statements that were similar to Plaintiff's testimony, for

27  which the ALJ properly gave reasons for discounting," Molina, 674 F.3d at 1122 (9th Cir. 2012)

28  (ALJ's failure to provide specific reasons for rejecting lay testimony was harmless error where

1   testimony did not describe any more limitations than those that plaintiff herself described, which

2   the ALJ validly rejected).

3          Specifically, in reviewing the third party witness statements, the ALJ stated:

4          Finally, I have considered the Third Party Function Report submitted by the
           claimant's sister and daughter.  These witnesses corroborate the claimant's
5          allegations of extreme physical and mental limitations . . . Because our
           regulations consider relatives such to be non-medical sources I have considered
6          these statements to be from an "other source" . . . The statements are given little
           weight.  For the reasons explained above the evidence establishes that the
7          claimant's impairments cause limitations but the many unremarkable objective
           physical and mental findings are inconsistent with the claimant's allegation that
8          she is incapable of performing any work . . . Furthermore, there is no evidence
           establishing that either of these witnesses has the medical training necessary to
9          make exacting observations as to medical signs and symptoms or their intensity.

10  (AR 25-26.)

11         The Court mainly agrees with Plaintiff that the ALJ's proffer that there is no evidence of

12  the lay witnesses' medical training, is not a convincing reason to reject a lay witness's testimony,

13  however, "[i]nconsistency with medical evidence" is a germane reason for discounting lay

14  witness testimony.  Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005); see also Lewis v.

15  Apfel, 236 F.3d 503, 511 (9th Cir. 2001) ("One reason for which an ALJ may discount lay

16  testimony is that it conflicts with medical evidence.").

17         Accordingly, the Court finds the ALJ's rejection of the lay witness evidence was based

18  on the germane reason of being inconsistent with the medical evidence, and was not error.  See

19  Bayliss, 427 F.3d at 1218 ("The ALJ accepted the testimony of Bayliss's family and friends that

20  was consistent with the record of Bayliss's activities and the objective evidence in the record; he

21  rejected portions of their testimony that did not meet this standard.  The ALJ's rejection of

22  certain testimony is supported by substantial evidence and was not error.").

23                                          **V.**

24                         **CONCLUSION AND RECOMMENDATION**

25         Based on the foregoing, the Court finds that the ALJ did not err in evaluating the

26  medical opinions, making an adverse credibility finding as to Plaintiff or the lay witnesses, in

27  developing the administrative record, nor in the ultimate determination of Plaintiff's residual

28  functional capacity assessment.  The Court finds the ALJ's decision to be supported by

substantial evidence in the record.   Accordingly, IT IS HEREBY RECOMMENDED that Plaintiff's appeal from the decision of the Commissioner of Social Security be denied.

This findings and recommendations is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.   Within **fourteen (14) days** of service of this recommendation, any party may file written objections to this findings and recommendations with the court and serve a copy on all parties.   Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).   The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.   Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 26, 2020**

UNITED STATES MAGISTRATE JUDGE

40